IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| HUONS BIOPHARMA CO., LTD., <br> Plaintiff, <br> v. <br> AQUAVIT HOLDINGS, LLC, <br> Defendant. | Civil Action No. <br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Huons BioPharma Co., Ltd. ("Plaintiff"), for its complaint against Defendant Aquavit Holdings, LLC ("Defendant") (together with Plaintiff, the "Parties"), hereby states as follows:

## NATURE OF THE ACTION

1. This action for breach of contract, anticipatory breach, specific performance, and injunctive relief arises from Defendant's breach of that certain License and Supply Agreement executed on April 12, 2021 (the "LSA"), attached hereto as **Exhibit A**, under which Defendant agreed to register, distribute, and Commercialize Plaintiff's botulinum toxin product (the "Product") in the U.S.[1]

2. Defendant materially breached the LSA by: (a) failing to provide a plan and timeline for clinical trials of the Product in violation of Section 9.2; (b) obstructing Plaintiff's right to audit Defendant's compliance with the LSA in violation of Section 7.5; and (c) withholding material correspondence between Defendant and the U.S. Food and Drug Administration ("FDA") regarding the approval status of the Product's application, and failing to

---

[1] Capitalized terms used and not otherwise defined herein shall have the meanings assigned to them in the Parties' License and Supply Agreement, dated April 12, 2021.

confirm it had the data necessary to address the clinical hold on such, in violation of Section 12.1.

3. Plaintiff terminated the LSA due to Defendant's material breaches and requested that Defendant return technical documents, confidential information, and other materials provided by Plaintiff in accordance with the terms of the LSA. Plaintiff also requested, pursuant to Section 19.2 of the LSA, that Defendant send to Plaintiff all documents and media containing Information relating to the New Drug Application ("NDA"), including all correspondence from the FDA, or any other correspondence or notifications from government agencies, vendors, or other service providers relating to the LSA. Defendant refused and threatened to further breach the LSA by ignoring the Parties' agreement to the exclusive jurisdiction of this court.

4. Plaintiff now seeks compensatory damages in an amount to be proven at trial but believed to exceed $75,000; attorney's fees and costs; a judicial determination confirming that its termination of the LSA was proper and effective; and an order compelling Defendant to provide to Plaintiff all documents, communications, and media in its possession or control relating to the subject of the LSA, including the NDA for the Product.

**PARTIES**

5. Plaintiff Huons BioPharma Co., Ltd. is a foreign corporation with its principal place of business at 7th Floor Huons Global Bldg., A-dong Pangyo I-Square, 17, Changeop-ro, Sujeong-gu, Seongnam-si, Gyeonggi-do, Republic of Korea (hereinafter, "Korea").

6. Defendant Aquavit Holdings, LLC is a limited liability company organized under the laws of Nevada. Defendant may be served with process at its registered address at 3753 Howard Hughes Pkwy, 2nd FL, Las Vegas, NV, 89169.

## JURISDICTION AND VENUE

7. This Court has personal jurisdiction over Defendant Pursuant to Section 22 of the LSA, which provides: "[e]ach party hereby submits to the exclusive jurisdiction of the Federal Courts of the State of Delaware, sitting in Wilmington, Delaware (sic) for adjudication of any dispute arising in connection with this Agreement."

8. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(2) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and is between a foreign corporation and a domestic company.

9. This Court also has jurisdiction under 28 U.S.C. § 2201 because this is a civil action seeking declaratory relief.

10. Venue is proper under 28 U.S.C. § 1391(b)(1) and (c)(2), as Defendant is deemed to reside in this District by virtue of its consent to personal jurisdiction in this District.

## FACTUAL ALLEGATIONS

**A.  The LSA Grants Defendant an Exclusive License to Commercialize the Product but Only Subject to Strict Performance Timelines and Regulatory Obligations.**

11. Founded in 1965, Plaintiff is a Korean pharmaceutical company and the leading Korean manufacturer of botulinum toxin type-A, commonly known in the U.S. as "Botox." Plaintiff developed and currently manufactures a formulation of botulinum toxin type-A under the name "Hutox" and wants to sell the Product on the U.S. market.

12. To accomplish this, Plaintiff engaged Defendant to submit an NDA with the FDA to approve the Product for sale and marketing in the U.S.

13. On April 12, 2021, the Parties entered into the LSA, which appointed Defendant as Marketing Authorization Holder (*i.e.*, the sponsor of the NDA for the Product) and granted Defendant exclusive rights "to import, distribute, promote, market, develop, offer for sale,

3

subcontract, and otherwise commercialize or exploit" the Product in the U.S. and Canada. (LSA, § 2.1.)[2]

14. In exchange for granting Defendant an exclusive license under the LSA, Plaintiff was to serve as Defendant's exclusive supplier of the Product and receive compensation including a $1,000,000 payment upfront, sizeable milestone payments, and royalties. LSA, §§ 5, 6. However, Defendant has failed to achieve any of the milestones set forth in the LSA and has not sold any amount of the Product. As a result, Plaintiff has received no payments beyond the initial $1,000,000.

### B. Plaintiff Upheld its Obligations under the LSA and Provided All Required Data.

15. Pursuant to Section 3.8 of the LSA, Plaintiff provided Defendant with a complete Common Technical Document ("CTD") package and subsequently furnished updated information on multiple occasions upon Defendant's request.

16. Nine months after receiving the first CTD package, Defendant informed Plaintiff that it couldn't open the files without specific software. Plaintiff worked with Defendant to resolve the alleged technical issue.

17. Having heard nothing from Defendant regarding its review of the first CTD package, Plaintiff followed up again, only to be asked to re-send the data for a third and then a fourth time.

---

[2] *See also* Aquavit Pharmaceuticals, Inc., *Aquavit to Introduce A New Botulinum Toxin (DTX-021)*, PR NEWSWIRE (Apr. 14, 2021), https://www.prnewswire.com/news-releases/aquavit-to-introduce-a-new-botulinum-toxin-dtx-021-301268845.html.

18. Beginning in January 2023, Defendant sent sporadic requests for information (typically prompted by Plaintiff requesting a status update), and Plaintiff routinely responded immediately (often within hours) with the requested data.

19. In contrast, Defendant has chronically refused to provide Plaintiff with information to which Plaintiff is entitled under the LSA, including but not limited to the clinical trial plan and timeline, and has frustrated Plaintiff's efforts to obtain the information.

**C.    Despite Plaintiff's Repeated Requests, Defendant Refuses to Provide the Clinical Trial Plan and Timeline, in Violation of Section 9.2 of the LSA.**

20. Defendant's exclusive license is subject to strict performance timelines and regulatory obligations. Section 9.2 of the LSA requires Defendant to provide Plaintiff with the "plan and timeline for the Clinical Trials of" the Product "within Two (2) months" of the execution of the LSA. That deadline passed on June 12, 2021, with Defendant having failed to provide the required clinical trial plan and timeline.

21. Plaintiff has repeatedly and continuously requested the clinical trial plan and timeline, both in-person and through written correspondence, and has never waived its right to receive the clinical trial plan and timeline.

22. Defendant has failed to respond to Plaintiff's repeated requests and, as of the filing of this Complaint, has not provided the required clinical trial plan or timeline.

**D.    Defendant Has Also Withheld Requested Correspondence with the FDA and Failed to Confirm it Has the Data Necessary to Address the Clinical Hold, in Violation of Sections 7.5 and 12.1 of the LSA.**

23. Section 7.5 of the LSA grants Plaintiff the right "to observe inspect and or audit [Defendant's] facility, books, records, personnel, suppliers and vendors to ascertain compliance by [Defendant] with the terms of this Agreement." (punctuation in original).

5

24. Section 12.1 of the LSA requires Defendant to act in good faith and to provide Plaintiff with "any necessary Information and such other information as may be reasonably required under this Agreement."

25. In the Summer of 2024, Defendant requested that Plaintiff appoint it as Plaintiff's representative in the European Union and, in connection with that request, provided Plaintiff with presentation materials for review. These materials revealed that, as of March 2024, the Investigational New Drug ("IND") application filed with the FDA for the Product had been placed on a clinical hold, halting all ongoing study activities. Defendant, however, never directly disclosed to Plaintiff that the IND had been placed on clinical hold.

26. Following its discovery of the clinical hold, Plaintiff requested multiple times that Defendant provide the correspondence from the FDA informing Defendant of the clinical hold (the "Clinical Hold Notice"). The Clinical Hold Notice specifies the additional information and data required by the FDA for the Product's IND to proceed beyond the clinical hold. Plaintiff is responsible for generating this supplemental information and providing it to Defendant, who, in turn, must submit the data to the FDA. Accordingly, it is essential that Plaintiff review the Clinical Hold Notice to determine precisely what data the FDA requires.

27. In addition to multiple requests for the Clinical Hold Notice, Plaintiff also requested Defendant's response to the Clinical Hold Notice, if any, and any other correspondence with the FDA, relevant documents concerning the clinical hold, and meetings with the FDA.

28. Defendant has not responded to any of Plaintiff's requests. The Product remains subject to the FDA's clinical hold, though Plaintiff does not have any information to understand

why. Meanwhile, a competitor progressed with FDA Phase 2 trials, putting Plaintiff at a competitive disadvantage.

        **E.**        **Plaintiff Attempted Repeatedly, Though in Vain, To Collaborate with Defendant to Advance the Product Beyond the Clinical Hold.**

29. On November 22, 2024, counsel for Plaintiff sent Defendant a letter by email and postal mail exercising Plaintiff's audit rights under Section 7.5 of the LSA.

30. Despite Plaintiff's request for Defendant to confirm receipt of the letter within ten days, Defendant did not respond.

31. Plaintiff learned that outside counsel listed as points of contact for Defendant in the notice provision of the LSA (§ 23) were no longer practicing with the law firm listed in the LSA and were both with different law firms at the time. Thus, Plaintiff sent the request letter to Defendant's commercial address in New York, New York, but the letter was returned as undeliverable. Notwithstanding the requirements of the LSA Section 23, Defendant did not and has yet to provide updated contact information to Plaintiff for service of formal notices.

32. On January 24, 2025, Plaintiff's counsel followed up with Defendant, reattaching its November 22 letter and warning Defendant that refusal to provide Plaintiff with the material correspondence from the FDA violates Section 12.1 of the LSA.

33. Despite Plaintiff's counsel indicating that all further communications intended for Plaintiff should be sent to Plaintiff's counsel, on January 28, 2025, Defendant sent a letter to Plaintiff's CEO alleging for the first time that *Plaintiff* had breached the LSA.

34. On February 11, 2025, Plaintiff's counsel replied to Defendant's January 28 letter rejecting Defendant's claims and allegations of a breach by Plaintiff, and renewing Plaintiff's request for the clinical trial plan and timeline for the Product and the relevant correspondence with the FDA. Plaintiff also requested confirmation that Defendant had the data necessary to

resolve the clinical hold. Plaintiff's counsel also proposed a business solution: Instead of an audit, the Parties could meet and develop an agreed-upon set of deliverables and next steps. Plaintiff's counsel requested that Defendant reply to this suggestion by February 18, 2025, but Defendant did not respond.

35. On February 26, 2025, Plaintiff's CEO sent an email to Defendant following up on counsel's February 11 correspondence. In the email, Plaintiff's CEO stated that Defendant's failure to comply with Sections 7.5, 9.2, and 12.1 constituted material breaches of the LSA. He further advised that if Defendant did not respond by March 7, 2025, Plaintiff would treat Defendant's silence as an indication that Defendant did not intend to cure the breaches or otherwise fulfill its contractual obligations under the LSA.

36. Defendant failed to respond.

**F.     The LSA Provided Plaintiff with the Right to Terminate the Agreement Due to Defendant's Uncured Material Breaches and Failure to Respond or Cure.**

37. Section 3.5 of the LSA states that the LSA may be terminated if Defendant "willfully or through its negligence fails to perform in accordance with the timeline stipulated in this agreement, and fails to remedy such failure within one hundred eighty (180) days after being notified by [Plaintiff] unless [Plaintiff] agrees to the delay through writing."

38. Similarly, Section 17.2(a) of the LSA provides that Plaintiff may terminate the LSA if Defendant "willfully or through its own gross negligence fails to perform the timeline stipulated in this agreement and fails to remedy such failure within one hundred (180) days after being notified by [Plaintiff] unless [Plaintiff] agrees to the delay through writing."

39. The only deadline expressly included in the LSA is the deadline referenced in Section 9.2—that Defendant is required to provide Plaintiff with the "plan and timeline for the

Clinical Trials of" the Product "within Two (2) months" of the execution of the LSA or June 12, 2021.

40.     Defendant failed to provide the clinical plan and timeline by June 12, 2021. Notwithstanding previous unanswered requests for the clinical trial plan and timeline, Plaintiff notified Defendant on June 17, 2022, of its failure to provide the clinical trial plan and timeline in accordance with Section 9.2 of the LSA. Ultimately, and despite numerous additional requests by Plaintiff for the information, Defendant failed to cure its failure within 180 days of being notified, or by December 14, 2022.

41.     In addition to the termination right under Sections 3.5 and 17.2(a), triggered by Defendant's failure to perform in accordance with the LSA's timeline or to cure such failure within 180 days of notice, Plaintiff may also terminate the LSA under Section 17.1: "Either Party may terminate this Agreement in the event of a material breach by the other party ("Breaching Party"), which breach is not cured by the Breaching Party after having received written notice of such material breach and 30 days having elapsed from the time of such notice without the material breach having been cured by the Breaching Party."

42.     On April 11, 2025, Plaintiff sent a letter to Defendant outlining Defendant's material breaches of the LSA under Sections 7.5, 9.2, and 12.1. The April 11 letter referenced Plaintiff's prior formal notice of these breaches, sent by email on February 26, 2025. Considering Defendant's failure to respond or take any steps to cure the breaches, the letter further notified Defendant of Plaintiff's intent to terminate the LSA.

43.     In its April 11 letter, pursuant to Section 19.2 of the LSA, Plaintiff demanded that Defendant send to Plaintiff all correspondence from the FDA and any other correspondence or

notifications from government agencies, vendors, or other service providers relating to the LSA. Defendant has yet to provide any of this information to Plaintiff.

44. On April 12, 2025, Defendant responded to Plaintiff's letter by email, denying that it had committed any material breaches of the LSA. Defendant further stated—despite the exclusive jurisdiction provision in Section 22 of the LSA—that it intended to initiate an investigation under Section 337 (ostensibly of the Tariff Act of 1930).

45. In addition to failing to provide a clinical trial plan and timeline as required by Section 9.2 of the LSA, Defendant has (i) prevented Plaintiff from exercising its audit rights under Section 7.5, and (ii) refused to provide necessary and reasonably required information under Section 12.1, including material correspondence with the FDA. Defendant's 30-day cure period expired no later than May 11, 2025, and Defendant has failed to cure any of these material breaches.

## Count I
**(Breach of Contract)**

46. Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 45 as if fully set forth herein.

47. The LSA constitutes a valid and enforceable contract between Plaintiff and Defendant.

48. Plaintiff has fully performed all its obligations under the LSA, or its performance was excused by Defendant's material breach.

49. Defendant has materially breached the LSA by: (i) obstructing Plaintiff's right to audit under Section 7.5; (ii) failing to provide the required clinical trial plan and timeline under Section 9.2, despite the deadline having passed nearly four years ago; and (iii) withholding

material correspondence with the FDA and failing to confirm it possessed the data necessary to address the clinical hold, in violation of Section 12.1.

50. Plaintiff provided Defendant with ample and adequate opportunity to cure these breaches in accordance with the LSA. To date, however, Defendant has failed to take any steps to cure its material breaches.

51. As a direct and proximate result of Defendant's breaches, Plaintiff has suffered both direct and consequential damages, including regulatory delay, loss of market opportunity, and reputational harm, in an amount to be determined at trial but believed to exceed $75,000.

**Count II**
**(Declaratory Judgement – Termination of the LSA)**

52. Plaintiff realleges and incorporates by reference the allegations of paragraphs 1 through 51 as if fully set forth herein.

53. An actual and justiciable controversy exists between Plaintiff and Defendant concerning the validity of Plaintiff's termination of the LSA.

54. Plaintiff contends, and seeks a declaration, that it properly and effectively terminated the LSA, by notice to Plaintiff on or before April 11, 2025, due to Defendant's material breaches of Sections 7.5, 9.2, and 12.1 of the LSA, and Defendant's failure to cure such breaches within the timeframes specified in the Sections 3.5, 17.1, and 17.2(a).

55. Accordingly, Plaintiff is entitled to a declaratory judgment pursuant to 28 U.S.C. § 2201 confirming the validity of its termination of the LSA.

**Count III**
**(Injunctive Relief)**

56. Plaintiff realleges and incorporates by reference the allegations of paragraphs 1 through 55 as if fully set forth herein.

57. In addition to declaratory relief, Plaintiff seeks injunctive relief compelling Defendant to produce and deliver to Plaintiff all documents, communications, and materials in its possession, custody, or control relating to the NDA for the Product that was the subject of the Parties' LSA, pursuant to Section 19.2 of the LSA.

58. Specifically, Plaintiff seeks an order requiring Defendant to immediately deliver to Plaintiff all the following materials related to the Product:

    a. All correspondence with the FDA relating to the Product;

    b. All filings, drafts, and internal communications concerning the NDA for the Product;

    c. All communications or notifications from any government agencies, including the FDA, relating to the Product;

    d. All correspondence or reports from vendors, contractors, or service providers involved in regulatory, clinical, or commercial work under the LSA; and

    e. All other records or materials generated or obtained in connection with efforts to register or Commercialize the Product in the United States.

59. Plaintiff has no adequate remedy at law for Defendant's failure to return or produce these critical regulatory materials. Such failure will cause immediate and irreparable harm to Plaintiff's ability to pursue alternative pathways for FDA registration and Commercialization of the Product.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

    a. Award Plaintiff compensatory and consequential damages in an amount to be proven at trial;

b. Award Plaintiff its costs and attorneys' fees to the extent permitted under the LSA or applicable law;

c. Enter a declaratory judgment that Plaintiff properly and effectively terminated the LSA;

d. Enter an order compelling Defendant to immediately deliver to Plaintiff all documents, communications, and other materials in its possession, custody, or control relating to the Product's NDA, including all correspondence from the FDA and any other communications from government agencies, vendors, or service providers relating to the LSA; and

e. Grant such further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: May 22, 2025

OF COUNSEL:

Tony Phillips (*pro hac vice* forthcoming)
Nicole Steinberg (*pro hac vice* forthcoming)
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
1200 17th Street NW
Washington, DC 20036
(202) 663.8000
tony.phillips@PillsburyLaw.com
nicole.steinberg@PillsburyLaw.com

**BAYARD, P.A.**

/s/ *Stephen B. Brauerman*
Stephen B. Brauerman (No. 4952)
Emily L. Skaug (No. 6921)
600 N. King Street, Suite 400
Wilmington, Delaware 19801
(302) 655-5000
sbrauerman@bayardlaw.com
eskaug@bayardlaw.com

*Counsel for Plaintiff Huons BioPharma Co., Ltd.*