**OF IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| HUONS BIOPHARMA CO., LTD.,<br>Plaintiff,<br>v.<br>AQUAVIT HOLDINGS, LLC,<br>Defendant. | Civil Action No. 1:25-CV-00636-UNA |

# PLAINTIFF'S OPENING BRIEF IN SUPPORT OF ITS MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Dated: May 23, 2025

OF COUNSEL:

Tony Phillips (*pro hac vice* forthcoming)
Nicole Steinberg (*pro hac vice* forthcoming)
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
1200 17th Street NW
Washington, DC 20036
(202) 663.8000
tony.phillips@PillsburyLaw.com
nicole.steinberg@PillsburyLaw.com

Stephen B. Brauerman (No. 4952)
Emily L. Skaug (No. 6921)
**BAYARD, P.A.**
600 N. King Street, Suite 400
Wilmington, Delaware 19801
(302) 655-5000
sbrauerman@bayardlaw.com
eskaug@bayardlaw.com

*Counsel for Plaintiff Huons BioPharma Co., Ltd.*

## TABLE OF CONTENTS

Page

I. INTRODUCTION ..... 1
II. LEGAL STANDARD ..... 4
III. ARGUMENT ..... 6
  A. Plaintiff is Likely to Succeed on the Merits of its Breach of Contract Claim Against Defendant. ..... 6
  B. Plaintiff Will Suffer Irreparable Harm Absent the Requested Relief. ..... 8
  C. The Balance of the Hardships Tips Decidedly Toward Plaintiff. ..... 10
  D. The Public Interest is Served by Preventing the Abuse of ITC Procedures, Protecting the Integrity of the FDA Clinical Trial Process, and Enforcing Defendant's Contractual Obligations. ..... 11
IV. CONCLUSION ..... 12

# TABLE OF AUTHORITIES

Page(s)

Cases

*Allegheny Energy, Inc. v. DQE, Inc.*,
171 F.3d 153 (3d Cir. 1999)....................10

*American Telephone and Telegraph Co. v. Winback and Conserve Program, Inc.*,
42 F.3d 1421 (3d Cir. 1994)....................13

*BE & K Eng'g Co., LLC v. RockTenn CP, LLC*,
No. CIV.A. 8837-VCL, 2014 WL 186835 (Del. Ch. Jan. 15, 2014), *judgment entered sub nom. Be&k Eng'g Co., LLC v. Rocktenn Cp, LLC* (Del. Ch. 2014), and *aff'd*, 103 A.3d 512 (Del. 2014)....................9

*Campbell Soup Co. v. ConAgra, Inc.*,
977 F.2d 86 (3d Cir. 1992)....................9

*Crowdstrike, Inc. v. NSS Labs, Inc.*,
C.A. No. 17-146-GMS (D. Del. Feb. 13, 2017)....................5

*Del. River Port Auth. v. Transamerican Trailer Transport, Inc.*,
501 F.2d 917 (3d Cir. 1974)....................5

*DTN, LLC v. Pioneer Hi-Bred Int'l, Inc.*,
No. CV 18-384-LPS, 2018 WL 1392343 (D. Del. Mar. 19, 2018)....................12, 13

*ECRI v. McGraw–Hill, Inc.*,
809 F.2d 223 (3d Cir. 1987)....................9

*EUSA Pharma (US), Inc. v. Innocoll Pharms. Ltd.*,
594 F. Supp. 2d 570 (E.D. Pa. 2009)....................10, 11, 13

*Impax Labs., Inc. v. Aventis Pharm. Inc.*,
235 F. Supp. 2d 390 (D. Del. 2002)....................12

*Ingres Corp. v. CA, Inc.*,
8 A.3d 1143 (Del. 2010)....................9

*Nat'l Indus. Grp. (Holding) v. Carlyle Inv. Mgmt. L.L.C.*,
67 A.3d 373 (Del. 2013)....................9

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*,
290 F.3d 578 (3d Cir. 2002)....................10, 12

*Phunware, Inc. v. Excelmind Grp. Ltd.*,
117 F. Supp. 3d 613 (D. Del. 2015)....................7

*Reilly v. City of Harrisburg*,
858 F.3d 173 (3d Cir. 2017), *as amended* (June 26, 2017) .......... 5

*Ride the Ducks of Philadelphia, LLC v. Duck Boat Tours, Inc.*,
138 F. App'x 431 (3d Cir. 2005) .......... 10

*Spark Therapeutics, Inc. v. Bluebird Bio, Inc.*,
2022 WL 605724 (D. Del. Jan. 25, 2022) .......... 5

*Takeda Pharms. USA, Inc. v. W.-Ward Pharm. Corp.*,
2014 WL 5088690 (D. Del. Oct. 9, 2014) .......... 4

*Texas Instruments Inc. v. Tessera, Inc.*,
231 F.3d 1325 (Fed. Cir. 2000) .......... 5, 6

*The Rsch. Found. of State Univ. of New York v. Mylan Pharms. Inc.*,
723 F. Supp. 2d 638 (D. Del. 2010) .......... 10

<u>Statutes and Codes</u>

United States Code
Title 19, Section 1337 .......... 1, 14
Title 19, Section 1337(b)(1) .......... 10

<u>Rules and Regulations</u>

Code of Federal Regulations
Title 19, Sections 210.9-10 .......... 10

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Plaintiff Huons BioPharma Co., Ltd. ("Plaintiff"), by and through its undersigned counsel, respectfully moves this Court for a Temporary Restraining Order ("TRO") and Preliminary Injunction (the "Motion") to restrain and enjoin Defendant Aquavit Holdings, LLC ("Defendant") (with Plaintiff, the "Parties") from initiating, threatening, or participating in any action or investigation before the U.S. International Trade Commission ("ITC") under 19 U.S.C. § 1337 ("Section 337"), or in any forum outside the jurisdiction of this Court. The requested relief pertains to disputes arising from or relating to the License and Supply Agreement ("LSA") between the Parties, including any complaint alleging unfair methods of competition or unfair acts concerning the importation of botulinum toxin products or related goods covered by the LSA.

## I. INTRODUCTION

On May 22, 2025, Plaintiff filed an action in this Court (the "Complaint") seeking damages, declaratory relief, and injunctive relief based on Defendant's multiple material breaches of the LSA, executed on April 12, 2021 (attached hereto as **Exhibit A)**. Under the LSA, Defendant agreed to register, distribute, and commercialize Plaintiff's botulinum toxin product (the "Product") in the United States and Canada. These obligations included securing regulatory approvals to market and sell the Product in the U.S., specifically by submitting a New Drug Application ("NDA") to the U.S. Food and Drug Administration ("FDA"). Now, more than four years after executing the LSA, Defendant has failed to fulfill this and several other material contractual obligations.

Over the course of the LSA's four-year duration to date, Defendant has materially breached the LSA on at least three occasions and has failed to cure those breaches. *First*, under Section 9.2 of the LSA, Defendant was obligated to provide Plaintiff with a plan and timeline for conducting clinical trials of the Product (the "Trial Plan") within two months of the execution of

the LSA (*i.e.*, by June 12, 2021). Defendant failed to meet this deadline. Since at least June 17, 2022, Defendant has disregarded Plaintiff's repeated requests—made both in writing and during in-person meetings—to deliver the Trial Plan or even to discuss establishing clear and enforceable milestones for its completion.

*Second*, Section 7.5 of the LSA grants Plaintiff the right to audit Defendant "to ascertain compliance by [the Defendant] with the terms of this Agreement, including without limitation … [the Defendant's] compliance with applicable Laws[.]"[1] Because Defendant failed to provide the Trial Plan, and Plaintiff learned—through publicly available sources—that the FDA had issued a clinical hold on the Product, Plaintiff exercised its audit right by sending a formal letter on November 22, 2024 (with a copy by email). Defendant did not respond. The letter, sent to Defendant's office address in New York, New York, was returned as undeliverable by the U.S. Post Office.

On January 2, 2025—following the Thanksgiving and year-end holidays—Plaintiff's counsel sent a follow-up email reiterating its request to conduct an audit under the LSA. In response, by letter dated January 28, 2025, Defendant's Chief Executive Officer, Ms. Sobin Chang, wrongfully rejected the audit request and instead threatened legal action against Plaintiff for alleged damages.

*Third*, Section 12.1 of the LSA obligates Defendant to act in good faith and to provide Plaintiff with "any necessary Information[2] and such other information as may be reasonably

---

[1] The LSA defines "Law" to include "any … laws, statutes, regulations, rules, guidelines, orders, and any other requirements of any government or Regulatory Authority applicable to the development [or] registration … of pharmaceutical products or as otherwise applicable to the Parties' respective obligations under this Agreement." LSA § 1.21.

[2] "Information" is defined in the LSA as "any and all information disclosed or otherwise made available by one Party (the "Disclosing Party") to the other Party (the "Receiving Party"), its

required under this Agreement." After learning that the Product's Investigational New Drug ("IND") application had been placed on clinical hold, Plaintiff requested specific documents necessary to assess and remedy the regulatory issues. The requested documents included: (1) the FDA's clinical hold letter (the "Clinical Hold Notice"), (2) Defendant's response to the Clinical Hold Notice, and (3) any additional correspondence or records related to the clinical hold or meetings with the FDA.

Defendant refused to comply. Instead, Defendant claimed that the FDA's feedback had already been conveyed "verbatim" during an in-person meeting of the Parties. However, Defendant has never produced the actual communications from the FDA or any supporting documentation clarifying the basis for the clinical hold or what would be required to lift it.

On February 26, 2025, Plaintiff's counsel formally notified Defendant of its material breaches of Sections 7.5, 9.2, and 12.1 of the LSA—specifically, for obstructing Plaintiff's audit rights, failing to provide the required Trial Plan, and withholding correspondence and other information from the FDA. Defendant failed to respond in any manner, let alone take any steps to cure its material breaches.

Given Defendant's continued non-responsiveness and refusal to cure its material breaches, Plaintiff notified Defendant on April 11, 2025, that it was terminating the LSA, effective immediately. Plaintiff's notice identified the specific contractual breaches and

---

agents, independent contractors or employees in any manner, whether communicated in writing or orally or by any method and all copies thereof, including without limitation, any business information, such as product or marketing plans and strategies, vendor or customer relationships, finances, or business operations or affairs, any information of legal nature, any information or know-how of scientific, technical or clinical nature, related to research or development efforts, future development, trade secrets, manufacturing processes, engineering, designs, Clinical Trial, field tests, process, technique, work-in-process, algorithm, program, design, drawing, formula or test data, formulations and methods of manufacture or use, and any other information which is or has been disclosed by the Receiving Party." LSA § 1.18.

Defendant's failure to cure them. The following day, April 12, 2025, Defendant acknowledged receipt of the notice (*see* **Exhibit B**) but did not address Plaintiff's substantive concerns. Instead, and despite the Parties' agreement to the "exclusive jurisdiction" of this Court (LSA § 22), Defendant rejected the termination and threatened "to assert all rights available to us, including the initiation of a Section 337 investigation before the U.S. International Trade Commission."[3]

Defendant's repeated failure over four years to cure its breaches—combined with its disregard for Plaintiff's good faith efforts to realign the Parties' goals and expectations—demonstrates Defendant's refusal to honor its contractual obligations. Unless enjoined by this Court, Defendant has indicated its intent to violate the LSA yet again by improperly invoking the ITC's Section 337 process to pursue retaliatory proceedings. Such conduct would not only cause Plaintiff irreparable commercial and reputational harm, but also would contravene the Parties' agreed-upon forum for dispute resolution.

## II. LEGAL STANDARD

Although the Third Circuit has not expressly held that the standard for issuing a TRO mirrors that for a preliminary injunction, district courts within the Third Circuit have routinely applied the same standard to both. *See Takeda Pharms. USA, Inc. v. W.-Ward Pharm. Corp.*, 2014 WL 5088690, at *1 (D. Del. Oct. 9, 2014) ("A request for a TRO is governed by the same general standards that govern the issuance of a preliminary injunction.") (citation omitted). A TRO is particularly appropriate where "a party faces the possibility of irreparable harm," and the relief is needed "to preserve the status quo and prevent such irreparable harm." *CrowdStrike, Inc. v. NSS Labs, Inc.*, No. CV 17-146-GMS, 2017 WL 588713, at *1 (D. Del. Feb. 13, 2017).

[3] To be clear, given its agreement to "exclusive jurisdiction" in this court, Defendant agreed to forego any right to seek redress for disputes in any other forum, including the ITC.

The Third Circuit has established that a preliminary injunction may issue where the moving party demonstrates: "(1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured …if the relief is not granted." *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017), *as amended* (June 26, 2017) (citing *Del. River Port Auth. v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917, 919–20 (3d Cir. 1974)). If this "threshold inquiry" is met, courts then consider "(3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest." *Id.* Thus, the court must determine "in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Spark Therapeutics, Inc. v. Bluebird Bio, Inc.*, No. CV 21-00705-WCB, 2022 WL 605724, at *3 (D. Del. Jan. 25, 2022) (citing *Reilly*, 858 F.3d at 179).

A preliminary injunction may also issue to enforce a forum selection clause by enjoining a party from initiating proceedings before the ITC. In *Texas Instruments Inc. v. Tessera, Inc.*, after the plaintiff filed a district court action concerning the termination of a license agreement, the defendant filed a Section 337 complaint with the ITC—mirroring Defendant's threat here. 231 F.3d 1325, 1327 (Fed. Cir. 2000). The Federal Circuit vacated the district court's denial of a TRO, holding that the ITC proceeding was covered by the license agreement's governing law clause (*id.* at 1331-32), which required that "any litigation between the parties relating to this Agreement shall take place in California."[4] Because ITC litigation occurs only in Washington, D.C., the Federal Circuit found that the defendant's action violated the parties agreed forum.

---

[4] The relevant clause in *Tessera* even lacked the clarity present here:

> "*Governing Law*. This Agreement shall be governed, interpreted and construed in accordance with the laws of the States [sic] of California as if without regard to its provisions with respect to conflicts of Laws. Both parities [sic] shall use their best efforts

Here, Section 22 of the LSA provides that this Court shall have "exclusive jurisdiction" over "any dispute arising in connection with this Agreement." Each of the four relevant factors supports enjoining Defendant from pursuing its threatened action before the ITC. Accordingly, the Court should grant Plaintiff's requested relief.

## III. ARGUMENT

Plaintiff seeks a temporary restraining order and preliminary injunction to prevent Defendant from making good on its written threat to initiate a Section 337 investigation before the ITC in retaliation for Plaintiff's rightful termination of the LSA due to Defendant's repeated, uncured breaches. Plaintiff satisfies all four factors required for injunctive relief, and the Court should grant the requested order to prevent the irreparable reputational, financial, and competitive harm that would otherwise result.

### A. Plaintiff is Likely to Succeed on the Merits of its Breach of Contract Claim Against Defendant.

To prevail on a breach of contract under Delaware law, a plaintiff must establish: (1) the existence of a valid contract; (2) a breach of an obligation imposed by that contract; and (3) resulting damages to Plaintiff. *Phunware, Inc. v. Excelmind Grp. Ltd.*, 117 F. Supp. 3d 613, 625 (D. Del. 2015).

Here, there is no dispute that the LSA is a valid and enforceable contract between the Parties. Defendant has materially breached multiple provisions of the LSA, including:

---

> to resolve by mutual agreement any disputes, controversies, claims or difference which may arise from, under, out of or in connection with this Agreement. *If such disputes, controversies, claims or differences cannot be settled between the parties, any litigation between the parties relating to this Agreement shall take place in California*. The parties hereby consent to personal jurisdiction and venue in the state and federal courts of California."

*Tessera*, 231 F.3d at 1327 (emphasis added).

(1) Section 7.5 – by obstructing Plaintiff's audit rights and failing to allow Plaintiff to verify compliance with the LSA (Compl. ¶¶ 23, 29-30);

(2) Section 9.2 – by failing to provide the Trial Plan, despite repeated requests and a contractual deadline that expired nearly four years ago (*Id.* at ¶¶ 20-22); and

(3) Section 12.1 – by withholding material correspondence from the FDA, including information regarding the clinical hold, and failing to confirm the FDA possesses the data necessary to address that hold (*Id.* at ¶¶ 24-28).

Defendant's breaches have caused substantial harm. Relying on Defendant's obligations under the LSA, Plaintiff expended considerable time and resources to support FDA approval of the Product. For example, Plaintiff prepared and delivered the Common Technical Document ("CTD")—a key component of the U.S. pharmaceutical regulatory process—within six months of executing the LSA (*Id.* at ¶ 15) and subsequently provided updates and responded to Defendant's sporadic information requests over the following two years (*Id.* at ¶¶ 16-18). Yet these efforts have been nullified by Defendant's noncompliance, which has contributed to the FDA placing a clinical hold on the Product (*Id.* at ¶ 25).

Further, Defendant's conduct has imposed significant opportunity costs on Plaintiff, including delay in entering the U.S. pharmaceutical market and lost revenue potential. Notably, Defendant failed to meet any of the milestones listed in Section 5.1 of the LSA and has yet to produce a Trial Plan. Compounding these failures, Defendant has refused to permit an audit of its compliance with the LSA (in violation of Section 7.5) and declined to provide critical information needed to lift the clinical hold (in violation of Section 12.1).

Despite Plaintiff's attempts in good faith over nearly four years to resolve these issues, Defendant has neither cured its breaches nor taken meaningful steps toward compliance. As a result, Plaintiff has been forced to pursue legal action and to incur additional costs to protect its rights. While the LSA envisioned that the Product would be launched in the U.S. by year four,

Defendant's breaches have, at best, caused unreasonable delay and, at worst, jeopardized the entire approval process.

For these reasons, Plaintiff has demonstrated a strong likelihood of success on the merits of its breach of contract claim, satisfying the first prong of the preliminary injunction standard.

### B. Plaintiff Will Suffer Irreparable Harm Absent the Requested Relief.

Plaintiff will suffer irreparable harm if Defendant is permitted to effectuate its threat to initiate a Section 337 investigation before the ITC. Monetary damages would be insufficient to redress the harms at stake.

To establish irreparable harm, Plaintiff "must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial." *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91 (3d Cir. 1992). In other words, "[t]he preliminary injunction must be the only way of protecting the plaintiff from harm." *Id.* In the context of a breach of contract claim, irreparable harm may be found where: (1) the subject matter of the contract is of such a special nature that damages would be inadequate; or (2) it is impracticable to ascertain the measure of money damages due to the contract's special or complex features. *See ECRI v. McGraw–Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987).

This case presents both scenarios. Drug registration and commercialization by a foreign entity in the U.S. is a specialized, high-stakes endeavor. It is impossible to quantify the cost or burden of submitting an NDA, especially where Defendant refuses to produce the FDA's justification for placing the Product on clinical hold. Without an injunction, Plaintiffs faces significant harm that cannot be remedied by monetary relief alone.

First, under Delaware law, being deprived of a valid forum selection clause constitutes irreparable harm. *BE & K Eng'g Co., LLC v. RockTenn CP, LLC*, No. CIV.A. 8837-VCL, 2014 WL 186835, at *23 (Del. Ch. Jan. 15, 2014), *judgment entered sub nom. Be&k Eng'g Co., LLC*

*v. Rocktenn Cp, LLC* (Del. Ch. 2014), and *aff'd*, 103 A.3d 512 (Del. 2014) ("Under binding Delaware Supreme Court precedent, a party suffers irreparable harm when forced to litigate in a jurisdiction other than the one selected by a valid forum selection clause.") (citing *Nat'l Indus. Grp. (Holding) v. Carlyle Inv. Mgmt. L.L.C.*, 67 A.3d 373, 385-86 (Del. 2013) and *Ingres Corp. v. CA, Inc.*, 8 A.3d 1143, 1147 (Del. 2010)). Plaintiff bargained for the exclusive jurisdiction of this Court under Section 22 of the LSA. Allowing Defendant to proceed before the ITC would defeat that bargained-for right.

Second, if Defendant initiates a Section 337 complaint, the ITC is statutorily required to commence a preliminary investigation and may impose sweeping exclusionary remedies. *See* 19 U.S.C. § 1337(b)(1); 19 C.F.R. §§ 210.9-10.[5] These remedies could block even lawful imports of the Product—and potentially other pharmaceutical products manufactured by Plaintiff—causing lasting commercial and reputational harm. Defending such an investigation would be time-consuming, expensive, and disruptive to Plaintiff's entry into the U.S. pharmaceutical market—the very scenario Plaintiff sought to avoid by negotiating the LSA's exclusive jurisdiction clause.

Moreover, courts recognize that loss of market share in the pharmaceutical industry may constitute an irreparable harm. *See e.g., The Rsch. Found. of State Univ. of New York v. Mylan Pharms. Inc.*, 723 F. Supp. 2d 638, 658 (D. Del. 2010); *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 596 (3d Cir. 2002) ("In a competitive industry where consumers are brand-loyal, we believe that loss of market share is a potential harm which cannot be redressed by a legal or an equitable remedy following a trial.");

---

[5] If the ITC institutes a full investigation, the agency's broad exclusionary remedies are extremely expedited and potentially severe. See 19 U.S.C. § 1337(b)(1) (requiring the ITC to conclude an investigation "at the earliest practicable time after the date of publication of notice of such investigation.").

*see also Ride the Ducks of Philadelphia, LLC v. Duck Boat Tours, Inc.*, 138 F. App'x 431, 434 (3d Cir. 2005) (citing *Novartis* to hold "that the loss of market share may be an irreparable injury.").

Obstructing Plaintiff's entry into the U.S. pharmaceutical market constitutes the loss of a "unique, non-replicable business opportunity" that also supports a finding of irreparable harm. *EUSA Pharma (US), Inc. v. Innocoll Pharms. Ltd.*, 594 F. Supp. 2d 570, 582 (E.D. Pa. 2009) (citing *Allegheny Energy, Inc. v. DQE, Inc.*, 171 F.3d 153, 164 (3d Cir. 1999)). In *EUSA Pharma*, the court emphasized that "given the uncertainty of FDA approval and future market conditions" the commercial value of a pharmaceutical drug "cannot be calculated without speculation." *Id.* The same is true here: Plaintiff can only speculate as to the value of the Product, or the cost of restarting the approval process, particularly in the face of Defendant's withholding of critical regulatory information.

Defendant's breaches of the LSA have already delayed Plaintiff's market entry and forced Plaintiff to initiate litigation simply to obtain information it is contractually owed under the LSA. If Defendant is permitted to initiate an ITC investigation—which would directly contravene the LSA's exclusive jurisdiction clause—Plaintiff will suffer further irreparable harm. The threat of exclusion from the U.S. market, damage to commercial credibility, and loss of customer trust are not compensable through money damages.

Accordingly, Plaintiff has met the second prong of the preliminary injunction standard.

### C. The Balance of the Hardships Tips Decidedly Toward Plaintiff.

The balance of hardships weights strongly in Plaintiff's favor. Plaintiff faces imminent and irreparable harm—including the potential loss of market access, reputational injury, and disruption of FDA approval efforts—should Defendant initiate an ITC investigation. By contrast, Defendant would suffer minimal hardship from a temporary restraining order that merely

enforces the Parties' agreed forum for dispute resolution. As courts have observed, such an order "will leave [Defendant] in the same position as it was in before the injunction was granted." *Impax Labs., Inc. v. Aventis Pharm. Inc.*, 235 F. Supp. 2d 390, 396 (D. Del. 2002).

Moreover, "the more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor." *Novartis*, 290 F.3d at 597 (citation omitted). Where, as here, Defendant has breached clear contractual obligations, courts have found the balance of hardships favors injunctive relief. *See DTN, LLC v. Pioneer Hi-Bred Int'l, Inc.*, No. CV 18-384-LPS, 2018 WL 1392343, at *2 (D. Del. Mar. 19, 2018). Given the above, the balance of hardships tips decidedly toward Plaintiff.

Defendant's hardship, to the extent any exists, is a predicament is of its own making. Defendant consented to the exclusive jurisdiction of this Court in Section 22 of the LSA, then proceeded to violate that agreement by threatening litigation elsewhere. Defendant has refused to cure its breaches despite numerous, commercially reasonable opportunities offered by Plaintiff to do so. Plaintiff's request merely seeks to preserve the contractual status quo and enforce Defendant's obligation to litigate in the agreed forum.

In sum, the harm to Plaintiff from being improperly subjected to an ITC investigation—or worse, an exclusion order—far outweighs any burden on Defendant from being required to honor its contractual commitments. Plaintiff has thus satisfied the third prong of the TRO and preliminary injunction standard.

### D. The Public Interest is Served by Preventing the Abuse of ITC Procedures, Protecting the Integrity of the FDA Clinical Trial Process, and Enforcing Defendant's Contractual Obligations.

Enforcing the terms of the LSA—including the exclusive jurisdiction clause—serves the public interest. Courts routinely hold that enforcing valid contractual obligations is in the public's interest (*see e.g., DTN*, 2018 WL 1392343, at *2), and where a party demonstrates both

a likelihood of success on the merits and irreparable harm, it "almost always will be the case" that the public interest favors preliminary relief. *American Telephone and Telegraph Co. v. Winback and Conserve Program, Inc.*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994).

Additionally, preventing misuse of trade enforcement mechanisms such as Section 337 actions protects both public institutions and legitimate market actors. Here, Defendant's threatened ITC complaint is a retaliatory tactic designed to sidestep the LSA's exclusive jurisdiction clause and disrupt the FDA approval process. Preventing such issue "protect[s] the integrity of the clinical trial process"—a recognized public interest. *EUSA Pharma*, 594 F. Supp. 2d at 583.

The court has an interest in safeguarding its jurisdiction and discouraging forum shopping. Enjoining defendant from pursuing a parallel ITC investigation upholds that interest and prevents unnecessary interference in an already complex regulatory process.

Accordingly, the public interest supports issuance of the requested injunctive relief, and Plaintiff has satisfied the fourth and final prong under the governing standard.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court issue a temporary restraining order enjoining Defendant from initiating, threatening, or participating in any action or investigation before the ITC under 19 U.S.C. § 1337, or in any other forum outside this Court's exclusive jurisdiction, with respect to disputes arising under or related to the LSA. This relief is necessary to preserve the status quo, prevent irreparable harm, and ensure enforcement of the Parties' contractual obligations, pending resolution of Plaintiff's motion for a preliminary injunction.

Dated: May 23, 2025

**BAYARD, P.A.**

OF COUNSEL:

Tony Phillips (*pro hac vice* forthcoming)
Nicole Steinberg (*pro hac vice* forthcoming)
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
1200 17th Street NW
Washington, DC 20036
(202) 663.8000
tony.phillips@PillsburyLaw.com
nicole.steinberg@PillsburyLaw.com

*/s/ Stephen B. Brauerman*
Stephen B. Brauerman (No. 4952)
Emily L. Skaug (No. 6921)
600 N. King Street, Suite 400
Wilmington, Delaware 19801
(302) 655-5000
sbrauerman@bayardlaw.com
eskaug@bayardlaw.com

*Counsel for Plaintiff Huons BioPharma Co., Ltd.*